May it please the Court, I'm Michael Huston of Perkins Coie, on behalf of NaphCare. I'd like to respectfully request five minutes for rebuttal. Okay, why don't you pause? I will, Your Honor. In Gordon v. County of Orange, this Court held that, where the record lacks evidence of any other event involving similar conduct or constitutional violations, Monell liability is not established. If it were true that there were a persistent and widespread practice at NaphCare's facility to use the medical watch floor for seriously ill patients who required advanced medical treatment, then it shouldn't have been too difficult for plaintiff to prove that fact. But plaintiff offered no evidence of that custom because that was not the practice at NaphCare's facility. There is no evidence in this record of any other event where a detainee at the jail was subjected to a substantial risk of serious harm. Ms. Hill's death was a tragedy, but it arose from a one-time mistake by a single NaphCare employee who undisputably failed to follow NaphCare's clear written instructions for how to treat severe abdominal pain. Was there any evidence in the record that she was aware of those instructions or had read them or been trained on them? Yes, absolutely, Your Honor. So the instructions are provided through the tech care form. This is the portal that nurses use to communicate what they are seeing and their observations and to receive instructions. The portal specifically describes that that is the correct standard of care for severe abdominal pain. You can send them to an advanced medical provider. And she testified, I think this is best reflected at page 1225 at the record, that if the patient were experiencing a severe or urgent condition, she understood that she was supposed to send her to a hospital or call an advanced provider. The nurse did not do that in this particular case because she made a judgment wrongly, tragically, that Ms. Hill's severe pain was attributable only to opiate withdrawal as abdominal pain is a relatively common symptom of opiate withdrawal. So that, again, that was a mistake. It shouldn't have happened, and NaphCare's policies, it's undisputed that NaphCare's policies are clear about what should have happened in this incident. For 10 out of 10 abdominal pain, you send the person to the hospital or call an advanced provider. But I think that just reinforces that we're dealing with a case where NaphCare's written policy is clearly constitutional. I think that makes the burden even higher on the plaintiff to demonstrate that in the face of that expressly constitutional policy, NaphCare actually had an unwritten custom to systematically violate the Constitution. And as I think this Court's cases reflect over and over again, you have to prove a pattern of incidents in order to demonstrate that custom. And certainly the absence of any testimony about any other evidence, any other incident in this record cannot establish Monell. Does the record say anything about people being received and then being evaluated and then sent out to urgent care or to other facility if they had an acute or urgent condition? Absolutely, Judge Collins, both with respect to this nurse and with more broadly. So Nurse Gubitz testified that she knew how to send patients to the emergency room. She felt comfortable doing so. She did so regularly. That's page 1273 in the ER. Lieutenant Hooper testified that patients were sent out of the facility for medical services, quote, every single week. That's page 838. Officer Worth testified about the regular policies and procedures that were in place to send patients out for medical treatment. That's at page 741. And Dr. Alvarez, who is the supervising chief medical officer, testified that he instructs all nurses, quote, when in doubt, send them out. That's page 972. Didn't Nurse Gubitz say that she sent Hill to the medical watch consistent with NaphCare's policy? So, Your Honor, she said that what she believed when she was asked by counsel for the estate, were your actions consistent with your usual practice when with NaphCare's policy? And she said, as far as I know, yes. So she clearly made a mistake. She was mistaken about her own – about what she was supposed to do. There's no dispute about that between the parties in the record. But that only goes to show it's not a matter of her own interpretation and what she thought. It's a question of what was the reality on the ground. This was a Saturday all this occurred, right? That's correct, Your Honor. And didn't – hadn't she previously complained to NaphCare itself that they should have a medical professional on duty on weekends and they didn't? She had raised issues about staffing on weekends. But there's no question – I don't think there's any evidence in the record that that was the moving force behind this injury. In other words, it's – Well, didn't she say that if there had been a staffing on the weekend, she would have sent Hill to the professional? No. No, absolutely not, Your Honor. The testimony is very clear from the nurse about this. She sent Ms. Hill to medical watch as opposed to a hospital because she made a judgment that Ms. Hill was only experiencing withdrawal symptoms, not a more serious condition. And that's it. It's really just the one thing in this case. It all hangs on that. She made that judgment. And in reliance on that judgment, she determined that.  But so what's the point of sending – the protocol was to send them to medical watch. But there was no – the protocol also was that there was no medical person actually watching the people when they were sent to medical watch on the weekend. So it appears from that testimony that NAFCARE delegated to the guards its responsibility for providing medical care and medical attention. So respectfully, I don't think that that is a – Isn't that a fair – I mean, we're talking about a jury verdict, right? Yes, we are. Absolutely, Your Honor. Okay, isn't that a fair inference from the testimony of Dr. – the expert, Dr. Roscoe, nurse – and nurse Gubitz? No. And the actual evidence about what the guards did on the weekend? No. Respectfully, Your Honor, that is not a reasonable inference from this record for a couple of reasons. You agree that's our standard? I do agree that that's the standard, whether a reasonable jury could conclude. But I think as a matter of law, remember that we're not talking about was there a mistake made here. There was a mistake made. There was a finding by the jury of negligence. NAFCARE has paid more than $2 million, and we are not here contesting the negligence verdict. We're talking about Monell liability. We're talking about whether there was a pattern or practice to systemically violate the Constitution that has to be persistent and widespread. I want to talk about Your Honor's reference to Laurie Roscoe's testimony. Laurie Roscoe, all she did was refer to the nurse's testimony. Laurie Roscoe did not do any independent investigation into what was the reality in the facility. All she's relying on is the nurse's deposition statement about what she did. So, and then I think with regard to the guards, the idea that, you know, my friend has said in her brief, there's nothing medical about Medical Watch. That's just simply not true at all. Guards, this testimony is in the record at page 1231. Guards observing Medical Watch patients called for nursing assistants, quote, at least once per shift. It happened every single day. The guards were trained to make observation about patients who were on Medical Watch and in the event that they needed additional assistance, to call for nurses or doctors, and they did so every single day. And again, the fact that there's not a single other incident in the facility where anyone was deprived of their constitutional rights, there's no other incident in this record where a person not only wasn't injured but didn't even face a risk of injury, they haven't identified anybody who was on Medical Watch who was not medically fit to be there. I want to come back to Your Honor's question a little bit about what was the practice. It's very important to specify who Medical Watch was for and who it was not for. The clear written policy, all the parties agree, was that with a person who has severe abdominal pain they should not The policy for Menil liability, the policy doesn't have to be written. It could be the informal practice that was followed. That's correct, Your Honor. But in order to demonstrate that practice and to show a persistent and widespread practice under the Supreme Court standard, you need to show, the plaintiff needs to show, a pattern of incidents where that practice occurred. And I think that's the whole point of the court's holding in Gordon. You need multiple incidents in order to make a practice. There's no testimony in this record about any other incidents. Right, but the jury decided that NAFCAIR had an unofficial policy of using medically untrained jail guards to monitor NAFCAIR patients in need of medical monitoring. Now, that was the policy, right? So, it's, I want to, may I make two points about that, Your Honor? Of course. The first is that, I think Your Honor is quoting the jury instructions. I think that before we get to the jury instructions, what we're really here talking about is NAFCAIR's Rule 50A motion that was denied. So, I think. Can we presume that the jury followed the instructions, though? Yes, but my point, Your Honor, is that before the jury got the case, the district judge made an error of law in submitting the case to the jury at all. And I do think that in this context specifically, the Supreme Court has instructed that juries are naturally going to experience a temptation to convert a negligence case and use that to impose respondeat superior liability that isn't permissible. And so, I think it's really the function of the court. Could a jury have reasonably concluded that he was in need of medical monitoring? That this patient was? That she was in need of medical monitoring. Absolutely, Your Honor. She absolutely was in need of medical monitoring. Could a jury reasonably conclude that she was in need of medical monitoring by medical personnel? Ms. Hill clearly was, Your Honor. Absolutely. But that just goes to the point. She should not have been on medical watch. That's the point exactly. The clear written policy is she needed to go to an advanced medical provider or to the hospital. I think the best reading of the jury instructions that Your Honor quoted is that when we talk about people in need of advanced medical monitoring, we're talking about seriously ill people. We're not talking about people who are the kind of people where it is appropriate to send to medical watch. People who have the flu. People who have diarrhea. People who have mild intoxication. Mild withdrawal symptoms. Those are the kinds of patients that were regularly sent to medical watch. But that's perfectly constitutional because putting somebody on medical watch who has those symptoms isn't facing a substantial risk of serious harm, this constitutional standard from Gordon. So that's what medical watch is for. It's not for people who have severe conditions. The clear written policy is, again, when in doubt, send those people out. So let's just assume for a moment that the jury properly found Monell liability. Would you address the ratio of punitive damages to actual damages that was awarded in this case? Absolutely, Your Honor. I appreciate the opportunity to do so. So I think there's a serious problem with the punitive damages, really for three reasons. The first is that I think, as we've discussed, plaintiff hasn't gotten over the line at all. The Monell claim was the only claim that could support punitive damages. But even if you find that plaintiff sort of inched over the line of Monell by having this contested testimony from one witness about a single incident, the ratio here is really extraordinary on the punitive damages. This is the largest correctional health care verdict in the history of the United States as far as NAFCA can tell. It wasn't remitted by a court. So in order for this court to conclude that, you know, the largest verdict ever in this space should be imposed, I think you have to find that NAFCA, under the constitutional standard and the federal common law standard as described by the Supreme Court of the United States, you have to find that NAFCA was the worst of the worst. And I would just respectfully submit there is no way that we could get to that conclusion in a record where there's no testimony that NAFCA decision makers knew anything about what was happening with respect to Medical Watch. They had no indication that there was a problem with how it was being implemented. There's no indication that the NAFCA policy for sending Monell. To back up, Nurse Gubitz did testify that she told NAFCA they should have medical personnel on the weekend. Yes, Your Honor. But again, that was not the cause of Ms. Hill's death. The problem in her case, the reason why her death occurred was not because of a lack of adequate staffing. It occurred because the nurse made a mistaken judgment about what was causing her pain and thus made a decision contrary to NAFCA's policy to send her to Medical Watch as opposed to sending her to the hospital. Let me put it this way. If the policy that everyone agrees that NAFCA had, if that policy were followed, there would be no problem. Ms. Hill would be alive. That's a mistake. The jury made a determination. Can we go back to the damages? Yes. What ratio does NAFCA think is the appropriate ratio to use in this case? Respectfully, I think in a case where the evidence just barely got over the line for Monell, and I really don't think there's ever been a case in this circuit that has found Monell liability on such a slim record, I think the appropriate punitive damages are zero. But the constitutional standard and the Federal common law standard that the Supreme Court has set up in State Farm and in Exxon sets an absolute outer limit of one to one. The Court in State Farm is talking about the fact that the national median is .65 to one, and as when we're talking about the Constitution, the Supreme Court says the median is going to be appropriate in most cases, and where punitive damages are — excuse me, where compensatory damages are substantial, which $2.4 million clearly is, an upper limit of one to one will apply. The Court said something very similar in Exxon as a matter of Federal common law, and I think that's — But it's also the 4.1, right, that's set forth in Planned Parenthood of Columbia, where it says if the behavior is not particularly egregious, a ratio of four to one serves as a good proxy for the limits of constitutionality. I think, Your Honor, in that case there was very — the compensatory damages were very different. And this is reflected in the Supreme Court's case law. The Supreme Court says, look, if you have a case where compensatories are small, $100,000, $200,000, something like that, it may make sense to have a higher ratio. But where the compensatory damages are 2.4 million, I think the Supreme Court, again, both in State Farm and Exxon, both at measure of constitutional law and Federal common law, is suggesting that a one-to-one limit is really the upper limit for those cases where there is exceptional blameworthiness, which there isn't in this case. Well, in Hardeman v. Monsanto, which is a Ninth Circuit 2021 decision, a 3.8 ratio was upheld. So, again, Your Honor, there are — there are outlier verdicts. But what I think — and there are — I think what that just gets at is you have to look at the Gore factors and determine, is NAFCAIR the worst? Is it the most reprehensible that you could exceed the upper limit? And is this a case where the ratio — where the nature of the compensatory damages can justify a heightened ratio? But this case clearly doesn't fall in that category because you, again, have $2.4 million, very substantial compensatory damages. I'd like to reserve the rest of my time for rebuttal, if I might. All right. Thank you, counsel. Ms. Ram? May it please the Court. Meg Haran for Plaintiff Appelli, the estate of Cindy Lujan. Now, the jury found that Ms. Hill's excruciating and entirely preventable death was directly caused by NAFCAIR's custom of using medically untrained jail guards to monitor patients who needed medical monitoring. And, Judge Wardlaw, as you noted, to override that unanimous verdict, NAFCAIR must show that even after drawing every inference in the estate's favor and disregarding all evidence favorable to NAFCAIR that the jury was not required to believe, the only reasonable conclusion is contrary to the jury's verdict. And it does not come close. I want to make sure I understand what the policy is that is alleged to be at issue here. Because the phrasing used in the instructions is, using medically untrained jail guards to monitor NAFCAIR patients in need of medical monitoring by medical professionals. It seems to me that there's implicit in this phrase and how it was understood by the medical monitoring by medical professionals. And if they had a policy where if you have determined that people are in need of medical monitoring by medical professionals and you send them to medical watch anyway, well, then that would be Monell liability and significant punitive damages. But did you prove that they had a policy that persons determined to be in need of medical monitoring by medical professionals were sent to medical watch? And was that even the case here? So I want to understand, is that what you're claiming the policy is? Or is it something else? So, Your Honor, I think there's a slight distinction there. So the jury found that people who needed medical monitoring by medical professionals were sent to this area of the jail where they didn't get it. People who objectively needed it but were not detected to have needed it? Not quite, Your Honor. Just people who objectively needed medical monitoring by medical professionals. What was the policy? Was there policy to send people determined? Or is it a policy? What is it? So, Your Honor, it could include people in both of those categories, people that nurses thought needed additional medical monitoring or people that objectively needed it and did not receive it. Now, this is. Is it your view their policy to send everyone to medical watch? There's no triage? The policy was to send people who needed medical monitoring by medical professionals. Who had been determined to need that? Again, Your Honor, I think that the — that can be construed in two ways, right? Nurses decided people who needed medical monitoring by medical professionals were sent there. There is evidence to support that. The custom is also, though, that people who needed medical monitoring objectively, as you said, were sent to this area where they didn't get it. There is also evidence to support that. So let me start with what Nurse Gobitz herself said. And Nurse Gobitz said, you know, everything she did as it relates to Cindy Hill was done pursuant to NAFCAIR custom. And this court said in both Gravelet-Blondin and in the unanimous decision issued just a couple of days ago in Nyarrecha that when an employee's belief that their conduct or someone else's conduct is consistent with a custom, that supports Monell liability. That is exactly what Nurse Gobitz testified here. Now, in addition to that, you know, my friend on the other side said that's the only piece of evidence. That is far from true. After Nurse Gobitz made this decision, NAFCAIR leadership, the Morbidity and Mortality Review Committee looked at what Nurse Gobitz did. They decided... I still don't feel like I've gotten an answer to my question. Does the policy you're alleging and that you proved and on which Monell liability rests, does it have as a component that there was a determination of need for medical monitoring by medical personnel? Yes or no? Is that an element?  It does not. It does not, Your Honor. So what then is the policy? If determination of medical necessity plays no role in the policy, what is the policy? The policy is to send people when what? When they need medical monitoring by medical professionals. Now, Your Honor, I think what you're saying is... But you just said that... I mean, a policy has to be applied. A person looks at the policy, makes a decision based on the policy. You're now telling me the policy doesn't include determination, but if it doesn't, then what is the policy to do what based on what determination? You have to make some decision with the policy. Your Honor, what I'm saying is that whether or not the specific nurses said, this person, you know, is at substantial risk of harm or not, people who needed medical monitoring, objectively speaking, were sent to this area of the jail, and that is a problem. Now, the 14th Amendment, to prove a 14th Amendment violation about medical needs, there is no knowledge component. You know, Nurse Gobitz did not have to know anything. Now, of course, there is evidence that she did. She specifically testified. She knew Ms. Hill was in distress. Also, her notes, her contemporaneous notes says, patient placed on 30-minute medical watch for severe abdominal pain and having to be dragged to door by cellmate to be assessed. Patient refused to get up to walk through the door, screaming and repeating, I'm sick, over and over. CO to Roseanne notified. And then she testifies that was pursuant to the policy of NAFCA. Absolutely, Your Honor. She wrote that in her contemporaneous medical notes. She also admitted at trial that she knew Ms. Hill was in distress. That's at 12-01. That she knew Ms. Hill was not faking or exaggerating. That's at 11-47. And then she sent that person in that state to this medical watch area. And where NAFCA is— Was there testimony about the purpose of sending someone? That's a determination, by the way. The purpose of determining someone needs to go to medical watch and sending them there. What was the purpose of that? Well, Your Honor, NAFCA's own expert, Expert Joshua, testified that medical watch was used for those people in between that the nurses didn't know whether they needed to be sent out to the emergency room or not, and additional time was needed to see if they declared their symptoms. So that's NAFCA's own expert explaining that medical watch was used for these people who were just shy of needing emergency room care to see how they declared their symptoms. Now, people who are declaring their symptoms who may need to go to the emergency room, certainly a reasonable jury could conclude that those people needed medical monitoring by medical professionals and yet were sent to a place in the jail where they did not receive it. And Expert Roscoe testified to the same thing. She said it was a regular practice to send acutely ill inmates over to the security guards for this medical watch practice. And, you know, my friend on the other side says that was recycling Nurse Gubitz's testimony. That's not so. Expert Roscoe looked at a number of depositions, including from NAFCA officials, people at the jail, policies and procedures of both the jail and NAFCA. Was the policy a proper subject for expert testimony? Your Honor, she reviewed a number of things, depositions and records. Does that require expertise beyond the ordinary knowledge of jurors? Your Honor, she was able to provide an eagle's eye view about what was happening at this facility, and NAFCA did not object to that testimony below. Well, but if it's just packaging up inferences from the underlying testimony and it's not really expertise, it doesn't really add anything. Well, Your Honor, NAFCA made zero objection below. And once testimony It's still in the record, but it doesn't add anything if it's just her opinion based on inferences that anyone else can draw that are not really a fit subject for expert testimony. Why don't you talk about the underlying evidence, is my point. Absolutely, Your Honor. I think that's a fair point because, I mean, objectively, I looked at this case and thought, they sent her to medical watch. Why wasn't anybody who was involved in medicine watching her? What is medical watch? Absolutely. This informal policy of sending people to medical watch. And you have guards who are totally untrained in medicine watching. So to me, it's an oxymoron. I don't even get it. Your Honor, I think that's correct. You don't need an expert to testify to this. It's obvious from the record. But an expert did testify to it. And in addition to that, Your Honor, NAFCA's own Morbidity and Mortality Review Committee looked at what Nurse Gobitz did in this case. They saw that note she wrote about Ms. Hill screaming and in severe abdominal pain. They saw that she then sent her to medical watch. And they said zero changes were required to policy, that they did not need to discipline Nurse Gobitz. And a jury could look at that and say, hey, this shows that this custom did exist at NAFCA. If they're not going to discipline or make any changes after they saw someone act pursuant to that policy. Do you dispute that there are not other incidents in the trial record of similar violations of constitutional rights? So, Your Honor, there were no specific prior incidents. Right? No John Doe or Jane Smith that we pointed to. But there absolutely were evidence that this was a widespread practice, that this has happened before. You know, Nurse Gobitz's testimony that she acted pursuant to custom supports that inference. The post-death approval by NAFCA supports that inference. But there's no proof in the record that anyone else died like Ms. Hill did after being sent to medical watch. Again, Your Honor, it's not in the record. And, you know, there's all sorts of reasons not to point to specific prior instances. You need to access medical records of other people, do a bunch of many trials.  But is there even in the record any evidence that anybody was permanently injured after being sent to medical watch? Your Honor, what we had to show was that there was a widespread custom of sending people in need of medical monitoring to this area. And testimony, the medical watch form, expert testimony all pointed to that. And this Court, you know, in a series of cases spanning decades, has said — has said there is enough evidence for a Monell custom when you have people testifying to that effect. So, for instance, in Navarro, there was zero prior incidents entered into evidence of the contested practice, but this Court said that there was sufficient Monell evidence about custom because a single person testified that that was the department's custom, an employee of that department. And then, again, in Wallace, zero prior incidents of harm, you know, naming specific prior people. There was none of that in the record. And, again, three officers said in that case, you know, the practice was not unusual, it happened fairly often, and that was enough to — for Monell liability. And, again, in Nahat and, again, in Nayaritza, a case decided by unanimous court just a couple of days ago. So, over and over, this Court has said what you need to show is evidence of a widespread practice. Certainly, that can be done by pointing to specific prior incidents because that would allow a jury to infer the existence of a custom from the fact that it's happened before. But also, you know, you can show it with much more direct evidence, evidence of employees of NAFCAIR saying this was a custom, I followed it, evidence by jail guards who described the custom and said that the custom existed, evidence of two different experts, including one of NAFCAIR's own experts, describing the practice. And then there's documentary evidence in the form of the medical watch form, which put this practice into effect. That form listed people — listed symptoms, like worsening chest pain, worsening abdominal pain. So if the practice is sending people who are objectively in need of medical monitoring by medical professionals in a — and failing to detect, basically, that that's what it is, and that's the practice, and that's been done regularly, is that practice itself unconstitutional, or do you need to show that it produced a pattern of unconstitutional violations? The custom was itself unconstitutional. As the district court found, the custom violated the Constitution with certainty because it led people who needed medical care to be denied it. And, Your Honor, just to your earlier line of questioning, I think as — But if there's no examples of other people in the record that suffered this kind of an outcome, how is it that the policy is per se unconstitutional? What the 14th Amendment says is reasonable measures have to be taken to abate a substantial risk of harm. And so certainly where there is substantial evidence that there was this widespread practice sending people at substantial risk of harm to a place where they were not getting any sort of medical monitoring, that custom does violate directly the 14th Amendment. And, Your Honors, if I may turn now to punitive damages, you know, the jury looked at this evidence, and they concluded that NACCR had this custom that caused a woman's death, and they awarded an amount of punitive damages necessary to punish and deter that conduct. Well, they — so going along with what you just said, that you just have to show this creates a substantial risk of harm, we have — I guess I'm going to quote Judge Gilman. This is kind of a situation where it's an accident waiting to happen. Like you're creating — the jury found they created the risk. It doesn't mean that other people have to die to prove the risk. You've proved the risk because someone actually died. But, okay, so that was — I would say that's pretty reprehensible under the proper tests. But the ratio of punitives to compensation in this case seems very high. Now, maybe that was the jury being really angry about this policy. I don't know. But, I mean, what's your defense of that ratio? Sure, Your Honor. You know, I don't think it's high at all in light of this reprehensible conduct. The Supreme Court specifically said in State Farm that single-digit multipliers — this is a single-digit multiplier — that those are more likely to comport with due process than the much higher ratios the Supreme Court struck down, right, 500-to-1, 145-to-1 ratios that were struck down. And then in State Farm itself, on remand, the Utah Supreme Court imposed a 9-to-1 ratio, and it said it was doing so in unwavering fidelity to that decision, and the Supreme Court denied cert. And that was a case involving a million dollars in compensatory damages for 18 months of emotional distress. So here, where you have much more serious harm than that, a lower ratio is certainly appropriate. And that follows from, you know, this Court's case law as well. As Judge Gilman noted, in the Hardeman case, that was a nearly 4-to-1 ratio in a case involving $5 million in compensatory damages, and where the physical harm, while serious, it was cancer, did not cause permanent injury. The Court specifically noted the person was in remission. It wasn't permanent harm. And so in a case like that, where there was more compensatory damages than in this case and less physical harm, a 4-to-1 ratio is appropriate. It certainly follows from that that an 8.7 ratio to 1 is appropriate in this case. But even under the standard of Planned Parenthood of Columbia, the 2005 Ninth Circuit case, don't you have to show that it was particularly egregious conduct to get a ratio beyond 4.4-to-1? Your Honor, the conduct here was reprehensible. And in assessing reprehensibility, this Court has to accept that. But it's not enough to be – I mean, Monsanto said the conduct of Monsanto was reprehensible but not particularly egregious, and therefore to prove the District Court's 3.8-to-1. To get beyond the 4-to-1, let's say, ratio of constitutionality, you've got to show particularly egregious conduct. What is particularly egregious here? Your Honor, Ms. Hill was a vulnerable person who was reliant on NAFCA to provide her care. Not like you and me, we can go to the doctor. She was completely at the mercy of this business, whose entire purpose was to provide care for people. And instead, they sent people who needed medical monitoring to a place where they absolutely would not get any. And that custom caused a woman to die an excruciating, painful, slow death, a death where she would have become confused and scared as her organs gave out. That's what Dr. Schuble testified. Wasn't this sort of an out-of-the-blue cause of death? I mean, she was in there for heroin withdrawal, and she dies of a perforated intestine. I mean, that's very atypical. It was sort of out of the blue, and this kind of thing had never happened before. So what makes this the worst of the worst? Your Honor, this was a custom that sent all people, not just people with conditions like this, but people who were at substantial risk of harm to this area of the jail. All people? I mean, you just said all people. It didn't send all people. Of course. There's a lot of evidence in the record that they were triaging people. Again, I go back. I don't understand what you're claiming the policy is at the triage stage. And what is the policy? Who gets shifted into this route? You just seem to be, it's a policy of making mistakes. Your Honor, it's a policy of sending people who need medical monitoring to a place where they're not getting it. That's what the jury found. That's the custom that NAFTA never objected to putting into the jury instructions. And that custom caused severe irreparable harm in this case, and it has a risk of repetition. That's also what makes this so egregious. You know, the district court specifically found that there was a risk of repetition. That's at 1 E.R. 58-59. And in assessing reprehensibility, we have to accept, this Court must accept, underlying facts found by the district court unless they're clearly erroneous. The district court found a risk of repetition. It found Ms. Hill vulnerable. It found that NAFTA acted in reckless disregard to the safety of people who needed medical care. Now, that's three out of the five aggravating factors in reprehensibility. Has any circuit weighed in on the question of whether ExxonMobil's one-to-one federal common law rule in the maritime context applies in the 1983 context? Has any circuit weighed in one way or the other on that? No, Your Honor. So to take that route would be breaking completely new ground, and this Court should not take that completely unwarranted step. And, Your Honor, I would also just note — Well, wait. The fact that no one's ever done it, why does that make it completely unwarranted? It's just an open question. Sure, Your Honor. But here, there's absolutely no reason to go there. You know, Exxon was clear that it was about maritime law. And this Court in Mendez said that any attempt to apply general federal common law rules for punitive damages in the constitutional tort context has to adapt to the purpose of 1983. That's, you know, when it's about deterrence and retribution. And imposing a one-to-one ratio in a case about 1983 torts would not further deterrence or retribution, right? It would basically be saying if you have a custom that kills a poor person, then there's going to be less deterrence, right? That is not what 1983 is about. But, Your Honor, I also want to go back to this idea that this is some sort of, you know, completely out-there punitive award. When practices cause death or substantial harm, courts have repeatedly approved, after doing constitutional due process review, have consistently approved multimillion-dollar punitive awards. You know, in Hardiman, it was a $20 million punitive award. In Moreland, concerning the death of a prisoner, it was nearly $30 million in punitives. In Boken, it was $50 million for cancer. In Union Pacific, it was $25 million for severe injuries. You know, we have a range of these cases in our briefing. And to look to those cases as comparable penalties is, first of all, inconsistent with this Court's case law, because the Gore third prong, you know, doesn't look to comparable awards. It looks to comparable statutory penalties. But if this Court were to look to comparable awards, there are a host of multimillion-dollar awards in cases where a corporation, an entity, causes either death or severe injury. And so this would be, you know, not an outlier. It would be a less than 9 to 1 ratio, so within the kind of well-worn path of ratios approved by this Court and the Supreme Court in a case of extreme reprehensibility. Your Honors, if there are no further questions, we ask this Court to affirm. Thank you. Thank you, Counsel. All right, Mr. Houston. Thank you, Your Honor. Much of my friend's presentation is about proving that Cindy Lou Hill should not have been on medical watch. That is right. That was why the jury found negligence, and we have accepted and paid that verdict. We're not here contesting it. Monell is about something different. It's about a widespread and persistent, to I think Judge Collins' questions illustrate, you must have evidence of at least other incidents where this occurred. Judge Gilman, you are exactly right. Not only did no one else die in NAFCARE's facility that this record suggests, no one was injured. There's no testimony that there was ever a near miss. There's no evidence that anyone was ever sent to the medical watch floor who was seriously ill. So there's not even the case that NAFCARE subjected anyone else to a risk of having their constitutional rights violated. And Gordon holds that you cannot find a Monell pattern or custom based on a single incident. There is no testimony. My friend refers to experts, the expert testimony. They're doing nothing but reciting the — from, you know, reviewing the depositions of the fact witnesses, the people who worked at the facility, and could testify what actually happened there. But there's no testimony from any guard, from any nurse, from any employee, that any seriously ill person, besides Miss Hill, was ever sent to medical watch. Contrast the Nyaretja case that my friend refers to. The court found Monell liability based on 26 separate incidents of constitutional violations performed by at least six different officers. That's how you prove a persistent and widespread custom. Judge Wardlaw, medical watch was for people who were mildly ill. People who had the flu. People who had diarrhea. Not concerning symptoms. The kind of stuff that if you took it, you called your doctor — Well, I did five days of the week. It was NAFCARE's policy to have medically trained people conducting the medical watch. But over the weekend, they didn't. There's no — Your Honor, respectfully, that's just not quite what happened. That's what Nurse Gubitz said yesterday. No, she didn't. Respectfully, that's not right, Your Honor. There's no difference in how medical watch was conducted. The policy was always the same. Mildly ill people, we can put them on medical watch where they're going to get extra monitoring as compared to the general population. Seriously ill people, we send them out of the hospital. That was the policy. That was followed on weekdays and on weekends. There's no difference about that. Again, these — it's also important to note, these people, when they went to medical watch — and Ms. Hill should not have been there, but people on medical watch, they were monitored. But people without medical training, how could they determine whether it was mild or serious? Two points. First of all, Your Honor, the determination whether it's mild or serious, that's being made by a nurse. This nurse just made a wrong judgment. But there's no evidence that it had ever — That was the predicate thing. She said she was suffering from abdominal pain, and that's why she put her on medical watch. And then she — then the — Ms. Hill was looked at at 3 p.m. that Saturday, but not again, except for by these untrained guards. So how could the untrained guards make a determination of whether she should be sent to the ER? Your Honor, what that shows is that the nurse made a critical, awful mistake. And we accept that. We're not here contesting it. But there's no incidence that it had ever happened again in any other case. And so you simply can't find a persistent and widespread practice. Even on medical watch, people were monitored by nurses, not by guards. Nurses checked on patients every shift, plus additional checks in accordance with their particular — But not on the weekends. No. Respectfully, Your Honor, that's just not correct. But Gubitz testified, too. No. No, she — I don't want to argue with you about that. The record's the record on that. I think the record demonstrates that there was no different — that there was — Nurse checked. But there is not a question that nurses monitored patients on medical watch at least once a shift. Nurses, not guards. All right. So do you — thank you. Thank you. You're over your time. The State of Sinulu Hill v. NAFCARE will be submitted and will
judges: Gilman, WARDLAW, COLLINS